the issue of damages, and to reduce the jury's award of damages.

By its motion, defendant essentially argues that defendant's view of the evidence was the most reasonable and should have been accepted by the jury. That, of course, is not the question before the Court, and even if true, would not permit the Court to overturn the jury's verdict. A jury's verdict may be overturned "only where the evidence points *all one way* and is susceptible of *no* reasonable inferences sustaining the position of the nonmoving party." *Zoll v. Eastern Allamakee Community School District,* 588 F.2d 246, 250 (8th Cir.1978) (emphasis in original).

After careful review of the evidence, the Court finds there was sufficient evidence to support the jury's finding of liability under 42 U.S.C. § 1981. As reflected in the Court's findings of fact and conclusions of law entered this day on plaintiff's claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., the jury could have reasonably concluded that plaintiff sustained both his ultimate burden of persuasion that defendant intentionally discriminated against plaintiff as well as his burden of production under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Defendant's arguments otherwise are unpersuasive.

The Court also finds the evidence sufficient to support the jury's award of $125,000.00 in damages. Although, in the opinion of the Court, the award is somewhat generous, the jury was not required to limit its award to specific monetary losses incurred by plaintiff. Damages for humiliation and emotional suffering are recoverable, and such an award may be supported solely on plaintiff's own testimony. *Williams v. Trans World Airlines,* 660 F.2d 1267, 1272–73 (8th Cir.1981). Given the evidence of plaintiff's emotional losses in addition to specific monetary damages, it cannot be said, as a matter of law, that the jury's award was excessive.

The Court has reviewed defendant's other arguments concerning the Court's eviden-

tiary rulings and plaintiff's duty to mitigate damages, and finds them unpersuasive.

For the reasons stated above, defendant's alternative motions will be denied.

Defendant also moves for stay of execution pending disposition of its post-trial motions. Having disposed of the post-trial motions, defendant's motion to stay execution will be denied as moot.

Pursuant to the local practice of having the Clerk of the Court issue writs of execution, plaintiff's application for writ of execution to this Court will be denied without prejudice to its presentation to the Clerk of the Court.

**R. Ward MUNDY, Plaintiff,**

v.

**Caspar W. WEINBERGER, et al., Defendants.**

Civ. A. No. 80–2096.

United States District Court, District of Columbia.

Dec. 23, 1982.
As Corrected Jan. 28, 1983.

James K. Stewart, Charles B. Wayne, Schwalb, Donnenfeld, Bray & Silbert, Washington, D.C., for plaintiff.

William H. Briggs, Jr., Asst. U.S. Atty., Washington, D.C., for federal defendants and individual defendants Cooke, West, Hamilton and Siemer.

Scott Blake Harris, Williams & Connolly, Washington, D.C., for defendant Kester.

## OPINION

HAROLD H. GREENE, District Judge.

This case raises important issues concerning the status of the United States Court of Military Appeals and the extent to which it may be controlled by others in the Department of Defense.

Plaintiff R. Ward Mundy, formerly the highest nonjudicial officer of the Court of Military Appeals (CMA), alleges that officials of the Department of Defense (DOD) blocked a promotion the court had granted him, thereby illegally interfering directly with the court's internal personnel matters and indirectly with its statutory independence from military control. He also contends that the DOD officials violated his First Amendment rights in that their failure to promote him was motivated by a desire to punish court employees who opposed DOD policies.

### I

■ Congress established the Court of Military Appeals in 1950 when it enacted the Uniform Code of Military Justice. Pub.L. No. 506, 81st Cong., 2d Sess., 64 Stat. 108 (1950), codified at 10 U.S.C. § 801–940. Created under Congress's Article I powers,[1] the court is composed of three civilian judges appointed for fifteen-year terms by the President with the advice and consent of the Senate. Although the tribunal is the "Supreme Court" of the military justice system,[2] Congress placed it in the Department of Defense "for administrative purposes only." Id. at § 867(a)(1).[3] To what extent this placement is a grant of supervisory authority to DOD, as opposed to a command that DOD merely provide nondiscretionary, ministerial assistance to the court, is the nub of this lawsuit.

The first encounter between the court and DOD involving plaintiff Mundy occurred upon Mundy's elevation, in Septem-

---

1. This was made explicit in a 1967 amendment to the Act. See Pub.L. No. 90–340, 82 Stat. 178 (amending 10 U.S.C. § 867(a)(1)).

2. Supreme Court review is available only through a collateral proceeding brought in federal district court.

3. The 1967 amendment added the word "only."

ber, 1976, from staff attorney to the newly-created post of Court Executive.[4] Chief Judge Albert B. Fletcher, Jr., in making the appointment,[5] sought to promote Mundy from the GS–14 grade he then held to a grade of GS–16. The Defense Department forwarded the chief judge's request to the Civil Service Commission with its endorsement. The CSC responded on March 16, 1977 that the two-grade advance would circumvent the Whitten Amendment, 5 U.S.C. § 3101 note, and therefore declined to promote Mundy or evaluate and classify the Court Executive position.[6] On March 27,

1977, Mundy was promoted one grade, to GS–15, an elevation that did not require waiver of the Whitten Amendment.

After Mundy had served as a GS–15 for nearly a year, Chief Judge Fletcher again attempted to promote him. On February 14, 1978, he forwarded to David Cooke, Deputy Assistant Secretary of Defense (Administration), a "personnel action" form and cover letter regarding Mundy's promotion to a GS–17 "as soon as administratively possible."[7] Fletcher also asked DOD to seek a waiver of the Whitten Amendment.[8]

See note 1, *supra.*

4. The position resulted from a restructuring of the Court's administration unanimously approved by the CMA judges. Where previously there had existed a Clerk of Court (GS–17) and a Chief Commissioner (GS–16), the reorganization established a Court Executive with two subordinates: Clerk of Court and Central Legal Staff Director. The CMA anticipated that the Court Executive would function at GS–17 or GS–18 with the two subordinate posts filled at the GS–16 level.

5. There is some question whether Fletcher, whose tenure as Chief Judge ran from June 1975 to April 1980, acted unilaterally or with the consent of at least one other judge (thereby constituting a majority) in his actions regarding Mundy. It is undisputed that a unanimous court approved the creation of the Court Executive post and that a majority of the CMA approved the initial selection of Mundy to assume that post. One judge, William H. Cook, submitted an affidavit at the government's request stating he never took part in discussions regarding Mundy's promotion to GS–17 or his inclusion in the Senior Executive Service, actions that Fletcher sought to effectuate at later times. Accordingly, the defendants maintain that an open question exists respecting whether "the authority to make high level promotions at CMA, such as the one at issue in this action, and to determine the career or non-career status of the Court's top staff position, rests with the Chief Judge or with the entire Court." This position is not well-taken. First, the record is bereft of evidence that DOD officials or other members of the CMA ever questioned the propriety of Fletcher's acting on behalf of the court at the time the events involved in this lawsuit were occurring. An unchallenged affidavit submitted by Fletcher avers that the Chief Judge traditionally exercised authority over the court's administration, but that Fletcher nevertheless did consult his colleagues regarding the reorganization. Second, the full Court did approve the creation of the Court Executive post and the appointment of Mundy to that post. Fletcher's subsequent actions thus merely implement that original design, negating in any event the need for reaffirmation by the full Court. Finally, the budget submitted by the CMA to Congress for fiscal years 1978–81 included the line item of Court Executive, GS–17. It is undisputed that Mundy was functioning as Court Executive during those years, even though DOD may have attempted to change his official title back to Attorney-Advisor in September 1978. In short, it appears, then, that a majority of the Court had acquiesced in the objective of promoting the Court Executive to GS–17, but even if they did not, having asked Congress for such an appropriation, members of the Court are now estopped from stating that they never intended to do so.

6. The Whitten Amendment, which expired in 1978, specified that no executive agency employee should be promoted "without having served at least one year in the next lower grade." In Mundy's case, the Civil Service Commission stated that it would be "inconsistent with good management practices" to classify the Court Executive post at GS–17 or GS–18 yet fill it for the time being with someone at GS–16. Thus the Commission declined to waive the Whitten Amendment to enable Mundy's promotion from GS–14 directly to GS–16.

7. Fletcher's letter was more of an announcement than a request. It stated, "Attached is a personnel action promoting Mr. Ward Mundy to Court Executive, GS–17, as soon as administratively possible."

8. The former Clerk of Court, Mundy's immediate predecessor as chief administrator of the court, had been granted such a waiver to enable him to advance from GS–15 to GS–17.

Despite the chief judge's request and his expression of urgency,[9] Cooke did not submit the request to the Civil Service Commission. Instead, in a memorandum to John Kester, Special Assistant to the Secretary and Deputy Secretary of Defense he addressed a wholly different issue of internal CMA management—that the terms of the Court Executive position be modified so that the person holding the job would serve at the pleasure of the Chief Judge.[10] Approval was apparently forthcoming, for Cooke's alternative was proposed to Chief Judge Fletcher some time during May, or early June, 1978. The chief judge rejected the modification, explaining in a letter to Cooke that a permanent, nonpolitical Executive was precisely what the Court needed. He further observed that the nonjudicial officer of the U.S. Tax Court was a GS–17, but noted the Court's resignation "to make do at the GS–16 level for one year" if the Civil Service Commission declined to grant the Whitten Amendment exemption. Despite a second letter to Cooke in October[11]

and a letter to Kester in December,[12] DOD had taken no steps by early 1979 to advance Mundy to either a GS–16 or GS–17.[13]

At this point the Civil Service Reform Act of 1978[14] somewhat altered the terms of the parties' stalemate. The Act created the Senior Executive Service (SES), 5 U.S.C. §§ 3131–36, thereby establishing a new, autonomous rubric for senior governmental employees and providing a new set of regulations for including an employee within this echelon.[15] The CMA's preference for three SES posts was reflected in the overall request submitted by DOD to the Civil Service Commission: one each for the Court Executive (described as "vacant" in the request), the Clerk of Court, and the Director of Legal Staff. In February, 1979, the Office of Personnel Management (OPM), successor to the Civil Service Commission, issued its tentative, government-wide SES slots, one for Court Executive and the other for Legal Staff Director.[16]

9. The chief judge explained in his cover letter that the Central Legal Staff Director, one of plaintiff's subordinates, was serving at a GS–16 level, her promotion having been processed by DOD and the Civil Service Commission. The subordinate was thus at a higher grade than the supervisor, a situation that had resulted in "internal stresses, both administrative and disciplinary."

10. In the memorandum, dated May 1, 1978, Cooke opined that the Court Executive position "clearly supports a supergarde at the 17 to 18 level" but added "if for some reason Judge Fletcher steps down as Chief Judge his successor would be saddled with Mundy .... In short, I think the ... Court Executive should ... serv[e] at the pleasure of the incumbent Chief Judge." The possibility that Fletcher might disagree was apparent to Cooke, as evidenced by his concluding sentence: "If you agree I will raise the subject with [Fletcher] so that he can appeal to you if he disagrees." The chief judge did appeal but to no avail, see *infra*.

11. The chief judge's displeasure at the delay in processing Mundy's promotion is evident. He wrote:
> I trust that this letter will suffice to expedite Mr. Mundy's promotion without further delay. I am sure you also can appreciate the friction which matters such as this generate in our relationship with your department since inaction in this instance directly impacts upon the effectiveness of the Court to fulfill its statutory duties.

12. In this letter Chief Judge Fletcher wrote, "I can only reiterate my surprise at the sort of treatment this matter has received." He asked Kester to "kindly give this matter your immediate attention and take whatever steps are necessary to advance our Court Executive to the GS–17 level."

13. DOD's response to the chief judge's three letters was to inform him by letter on January 11, 1978 that Kester had resigned and been replaced with Togo D. West. Cooke wrote that "We will be bringing this case to [West's] attention shortly, and I am sure he will be in communication with you once he has reviewed the matter with me and with the General Counsel."

14. Pub.L. No. 95–454, 95th Cong., 2d Sess., 92 Stat. 1111 (1978).

15. The SES was designed to attract competent senior governmental employees by providing compensation based upon individual performance and by otherwise recognizing individual achievement. 5 U.S.C. § 3131. It became effective on July 13, 1979.

16. Apparently the two SES positions for the court were part of the total allocated to DOD but were not specifically designated as being reserved for the court.

Nevertheless, the DOD personnel office forwarded to CMA only the forms for the second position. In line with what OPM had told him, Chief Judge Fletcher then drafted a duplicate "offers" form and presented it to Mundy in late March, 1979.[17] Mundy accepted the offer on April 9, 1979. As far as the Chief Judge and Mundy were concerned, Mundy was now a member of the SES.

This was not the end of the matter, however, for notwithstanding the decisions of both OPM and the chief judge of the CMA, the offer and acceptance were not recognized by the Department of Defense.[18] Despite a final request by Chief Judge Fletcher dated June 19, 1979, Mundy was never included within the SES nor promoted above a GS–15.[19]

On August 18, 1980, Mundy filed this lawsuit; later, on May 30, 1981, he resigned.[20] Mundy alleges that DOD officials prevented his promotion in retaliation against his criticism of DOD policies, including DOD's treatment of the CMA, and that in any event their actions violated the statute creating the CMA as an independent, Article I tribunal. He seeks (1) a judgment against the official defendants[21] and an award of back pay for their obstruction of his promotion; and (2) damages against the individual defendants,[22] under both *Bivens v. Six Unknown, Named Agents of the Fed-*

*eral Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and 42 U.S.C. § 1985(3). Plaintiff has moved for summary judgment on the first claim. The individual defendants have moved for dismissal of the remainder of the complaint. The Court rejects plaintiff's claims against the individual defendants but will enter a judgment in favor of plaintiff against the official defendants.

## II

The various defendants raise a number of technical, threshold issues which will be discussed before turning to the merits of the complaint.

■ 1. *Venue.* Four of the five individual defendants have moved for dismissal on the ground that as to them venue in the District of Columbia is improper, because they neither lived nor worked within the District at the times relevant to this lawsuit.

The Court finds that the geographic placement of the Pentagon across the Potomac River[23] from the bulk of the U.S. government's principal offices does not deprive this lawsuit, which is largely a dispute between high-ranking federal officials, of its solid grounding in the District of Columbia.

17. Also at this time the allocation of SES slots to DOD was officially made and letters were sent to all persons eligible for conversion to the SES. Mundy did not receive such a letter.

18. Incident to its implementation of the SES, OPM had delegated to the Secretary of Defense the authority formally to classify individuals as GS–16, 17, or 18 and to designate individuals at those grades as members of the SES. This delegation took effect on May 9, 1979. The secretary then delegated this responsibility to defendant Cooke.

19. On July 9, 1979, unbeknownst to Mundy, a DOD personnel officer also recommended that the Court Executive's position be classified at GS–17 and that Mundy be promoted to it, thereby ensuring his eligibility for the SES.

20. The defendants incorrectly maintain that Mundy's resignation moots this action. Although that resignation renders the claim for

injunctive relief academic, it does not affect the claim for damages in the form of back pay. Moreover, the events following Mundy's resignation—his subsequent hiring by the new 11th Circuit Court of Appeals as its Assistant Circuit Executive—only enhance his case by undermining any implication by DOD that its stance toward Mundy may have been based on a well-founded concern over his competence.

21. These are the United States, the Secretary of Defense Weinberger, Director of OPM Campbell, and DOD officials Hamilton, Cooke and West.

22. These are Hamilton, Cooke, West, Kester and Siemer.

23. The Pentagon, of course, is situated in Arlington, Virginia, which lies within the Eastern District of Virginia.

■ To determine where a claim arose, a court should engage in a "common sense appraisal" of "events having operating significance in the case." *Lamont v. Haig,* 590 F.2d 1124, 1134 (D.C.Cir.1978). Venue is proper "if the activities that transpired in the forum district were not insubstantial in relation to the totality of events giving rise to the plaintiff's grievance and if the forum is generally convenient for all litigants." *Lamont, supra,* 590 F.2d at 1134 n. 62.

Plaintiff's former place of employment, the Court of Military Appeals, is located in the District of Columbia. This is especially significant considering that his grievance stems directly from his employment and from the decisions of others about that employment. The defendants' involvement in this suit may well have consisted primarily of decision-making in their Pentagon offices,[24] but this decision-making was not the formulation of general policy that might affect scores of persons. It was the formulation of one decision, the results of which affected one person, holding a unique job, known to be working in a one-of-a-kind federal office located in Washington, D.C., precisely because that city is the nation's capital. Indeed, the Pentagon, too, is located where it is because of its proximity to the nation's capital; it even uses a Washington, D.C. mailing address. For these reasons, the Court finds that venue was proper here. That is not to say that all activities occurring in any U.S. government office located near the District of Columbia may give rise to venue in this District. Suffice it to say that the Pentagon is hardly "any" federal office. Here, the plaintiff's grievance and the acts that gave rise to it are inextricably bound up with the District of Columbia in its role as the nation's capital. Sufficient connection with the District exists that venue is proper here with respect to the individual defendants, "notwithstanding that venue might also lie in other districts." *Lamont, supra* 590 F.2d at 1134 n. 64. The Court observes, finally, that to uphold venue in the District is not inconvenient for the defendants. The District of Columbia is not significantly less accessible to an individual who lives or works in the Eastern District of Virginia— as the defendants allege they do—than would be Alexandria, the seat of that district.

■ 2. *Standing.* The official defendants and the United States challenge plaintiff's standing to pursue that part of his claim that alleges a violation of the statute creating the Military Court of Appeals, 10 U.S.C. § 867(a)(1). However, it is clear that plaintiff has satisfied the three standing requirements operative in this Circuit.[25] See *Control Data Corp. v. Baldrige,* 655 F.2d 283, 288 (D.C.Cir.1981).

Plaintiff alleges that he was deprived of his rightful salary because of the actions of the defendants. This economic injury would be redressed were the Court to order payment to him of the withheld funds. Thus, plaintiff has alleged an "injury in fact," the first of the three requirements. The second prong of the standing inquiry requires a look at the purpose of the statute that created the Military Court of Appeals to determine whether the defendants' alleged action "injured an interest arguably

24. The U.S. Court of Appeals for the District of Columbia impliedly held in *Lamont v. Haig, supra,* that acts occurring inside the Pentagon may be considered acts occurring within the District of Columbia for venue purposes. In that case, numerous military and nonmilitary personnel were sued in the District. At least two had offices in the Pentagon, where they were served with process. Other defendants worked within the District proper. In its discussion of the factors the district court should consider on remand to determine whether venue was proper in the District of Columbia, as opposed to South Dakota where the effects of the decisions allegedly made in Washington were felt, the Court of Appeals drew no distinction between those defendants with offices in the Pentagon and those with offices in the District, nor did the district court do so on remand. *Lamont v. Haig,* No. 75–271 (D.D.C. February 26, 1981).

25. These requirements have been developed in cases where a plaintiff complains of formal administrative action taken pursuant to a statute. Although Mundy complains of *informal* agency action the same standing analysis is appropriate.

within the zone of interests to be protected or regulated by the statute ... in question," *Control Data, supra,* 655 F.2d at 288, that is, whether there are "some indicia— however slight—that the litigant before the court was intended to be protected, benefited or regulated by the statute under which the suit is brought." *Copper & Brass Fabricators Council, Inc. v. Department of the Treasury,* 679 F.2d 951 at 952 (D.C.Cir. 1982).

Mundy claims that the actions of DOD officials infringed upon the independence of the Court of Military Appeals by interfering with its personnel decisions. The establishment of an independent military tribunal was Congress's principal objective in enacting 10 U.S.C. § 867. See Part III *infra.* The independence of a court depends to a large extent on the independence of its personnel from power centers outside the court. For these reasons, it is appropriate to conclude that Congress, in undertaking to provide for an independent court, necessarily intended to protect the independence of a high-level court employee such as Mundy.[26] The third standing component, that there be no "clear and convincing" indication of a legislative intent to withhold judicial review, poses no barrier here for no such indication has been presented to the Court. Accordingly, the standing challenge fails.

■ 3. *Joinder.* Defendants next claim that the Court of Military Appeals is an indispensable party to this action because, in deciding this case, the Court will have to ascertain the proper relationship between the Court of Military Appeals, the Defense Department, and the Office of Personnel Management. Defendants have entirely failed to show that the CMA is " 'needed for just adjudication,' " *Park v. Didden,* 695

F.2d 626 at 629 (D.C.Cir.1982), slip op. at 6, such that dismissal would be warranted under Fed.R.Civ.P. 19. Adequate relief can be accorded in the court's absence, and any judgment for or against plaintiff will not impair the court's interests to such an extent that it should be regarded as an indispensible party under Rule 19(b).

■ 4. *Exhaustion of Administrative Remedies.* Defendants contend that plaintiff has failed to exhaust his administrative remedies under the Civil Service Reform Act of 1978, the Classification Act, the Federal Tort Claims Act, and the Federal Employee Compensation Act, and that he therefore may not press his claim in this Court. Plaintiff's claim is not brought under any of these statutes and therefore whatever exhaustion requirements they may contain are not applicable. He seeks back pay on the theory that he was promoted to a GS–17 level but denied the emoluments of that office through defendants' illegal actions; he also seeks damages under a *Bivens* theory and pursuant to 42 U.S.C. § 1985(3). These remedies carry no exhaustion requirement.

■ 5. *Res Judicata.* Relying upon *Miele v. Brown,* No. 77–1346 (D.D.C. August 29, 1977) defendants argue that the action is barred by res judicata and collateral estoppel.[27] However, the judgment in that case simply established "[t]hat employees of the Court of Military Appeals are entitled to continue to be under the civil service system." Plaintiff does not contest the applicability of the civil service laws to his former position. He alleges wholly different violations: that the Department of Defense improperly interfered with employment rights afforded by other sources, namely 10 U.S.C. § 867 and the First Amendment.

**26.** The "zone of interests" test incorporates into the standing inquiry elements of the test used to determine whether a private cause of action should be implied from a statute, for the latter also is concerned with "which class of litigants may enforce in court legislatively created rights or obligations." *Davis v. Passman,* 442 U.S. 228, 239, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979).

**27.** In *Miele,* twelve employees of the CMA sued the CMA's judges, the Secretary of Defense and the Chairman of the Civil Service Commission seeking to overturn a decision of the CSC that the court was part of the judicial branch and thus not subject to the civil service system. The case was terminated by stipulation.

6. *Sovereign Immunity.* Defendants contend finally that, even if they acted unlawfully in refusing to effectuate Mundy's promotion, his request for back pay is barred by the doctrine of sovereign immunity. *Land v. Dollar,* 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947).

 This position, too, is not well-taken. Sovereign immunity does not bar a suit where one "had been denied the benefit of the position to which he was appointed." *United States v. Testan,* 424 U.S. 392, 402, 96 S.Ct. 948, 955, 47 L.Ed.2d 114 (1975). Here, plaintiff asserts that the acts of OPM and the CMA were sufficient to accomplish his "appointment" to the new position. If that is the case, DOD's improper withholding of formal approval merely denied Mundy the "benefit" of this position. Indeed, Congress appropriated the funds that Mundy seeks. The budget covering the Court of Military Appeals specifically included funds for a Court Executive at grade GS–17 for the fiscal years 1978–81. See note 5 *supra.* The appropriation may be regarded as signifying the government's consent to the expenditure of the funds for which Mundy brought suit.

In short, like the French police inspector in the motion picture "Casablanca"—who inevitably and unsuccessfully ordered a round-up of the "usual suspects" following an assassination—the government here has, once again, inevitably failed in its reliance on its usual technical defenses.

### III

The core of plaintiff's claim is that by overruling or ignoring the personnel decision of the chief judge acting for the court, the DOD violated the letter and the spirit of the congressional mandate that the Court of Military Appeals be an independent, judicial tribunal which is a part of DOD "for administrative purposes only." 10 U.S.C. § 867(a)(1).

The legislative history of the Uniform Code of Military Justice reveals that Congress had two basic aims in establishing the Court of Military Appeals. First, it wanted to ensure uniform application of the new code. See 96 Cong.Rec. 1362 (1950) (remarks of Sen. Kefauver). Second, and more important in terms of this lawsuit, Congress intended to reduce the level of command control over the military justice system. The Congress believed that public confidence in the fairness of military justice would be promoted by the establishment as the highest tribunal in the military justice system a court composed of civilians who would not be controlled by the Secretary of Defense or by any of the branches of the military service.[28] The objective of reducing command influence is apparent in the Code itself, see 10 U.S.C. § 837, in military procedural law, see Mil.R.Evid. 606(b), and in the decisions of the Court of Military Appeals under the Code. See, *e.g., United States v. Rosser,* 6 M.J. 267 (C.M.A.1979); *United States v. Cole,* 17 U.S.C.M.A. 296 (C.M.A.1967) ("one of the basic objectives of the Uniform Code of Military Justice is to eradicate [the] misuse of command power. . . ."); *United States v. Johnson,* 14 U.S.C.M.A. 548, 551 (C.M.A.1964) ("the apparent existence of 'command control' . . . is as much to be condemned as its actual existence."); *United States v. Littrice,* 3 U.S.C.M.A. 487, 491 (C.M.A.1953) ("[C]ongress expressed an intent to free courts-martial members from any improper and undue influence by commanders. . . ."). The creation of the CMA was, in fact, the primary reform of the Uniform Code, a means by which Congress strove to effect "a compromise between the demands for justice on the one hand, and the demand for an efficient, well-disciplined and fighting Army on the other." West, A History of Command Influence on the Military Justice System, 18 U.C.L.A.L.Rev. 1, 86 (1970). See also Willis, The United States Court of Military Ap-

---

**28.** This concern is apparent in the House report that complains "the general public . . . look with suspicion upon all things military and particularly on matters involving military justice." H.R.Rep. No. 491, 81st Cong., 2d Sess. 6 (1949).

See also 96 Cong.Rec. 1362 (1950) (remarks of Sen. Kefauver); *Schlesinger v. Councilman,* 420 U.S. 738, 757–58, 95 S.Ct. 1300, 1312–13, 43 L.Ed.2d 591 (1975).

peals: Its Origin, Operation and Future, 55 Mil.L.Rev. 39 (1972).[29] It was a "compromise" opposed by the military. Thus, the new court "entered an environment that was less than enthusiastic about its creation." Willis, *supra*, at 71. Military hostility toward the court manifested itself in public criticism of specific decisions, particularly those that incorporated constitutional safeguards into military law, and, in the early 1960s, in proposals to rein in and even disband the court. Although these proposals were rebuffed by Congress,[30] the commentators state that the Court of Military Appeals has still a long way to go to eliminate command control over the court-martial process.[31]

Against this background of conflict between the military command and the court, the government defends the Defense Department's actions in the instant case by relying essentially only on the provision that places the CMA in that Department for certain purposes. DOD officials contend that they treated the court's personnel request no differently from the manner in which they treat those respecting non-court DOD employees.

In the view of this Court, the defendants wholly fail to appreciate the difference between a court and yet another military unit; and they have also interpreted "administrative purposes *only*" (emphasis added) as conferring too much authority on the

Department of Defense to use its discretion to contravene the policy decisions of the Court of Military Appeals, and particularly its decisions with respect to the appointment and compensation of its key officials. For the fact is that DOD's interpretation and its conduct in this case are simply inconsistent with Congress's wish that the court be independent.

The legislative history of subsequent amendments to 10 U.S.C. § 867 indicates that Congress passed these amendments to counter claims that the court was "an instrumentality of the executive branch or an administrative agency within the Department of Defense." S.Rep. No. 806, 90 Cong., 1st Sess. 2 (1967). Indeed, the Senate Committee observed that the Court's placement in DOD was intended "only to reduce expenditures for the administration of the relatively small staff of the Court . . . [and] meant merely to authorize the Department of Defense to furnish such things as telephone services, transportation facilities, and to purchase "supplies." *Id.* As for other matters, "[t]he court justifies its own budget and funds are appropriated for its operations with no control exercised by the Department of Defense." *Id.*[32]

■ In view of these authorities it cannot be seriously disputed that Congress intended the Court of Military Appeals to operate autonomously.[33] In the view of this

---

**29.** The Code was enacted in the aftermath of World War II. Both during and after the War, "[l]egal writers were to condemn the military justice system, newspaper editors were to tear it apart, and various governmental committees and bar associations were to take up the fight for dramatic reform of military law." West, *supra*, at 73.

**30.** Congress amended the provision creating the court in 1967 to make it explicit that the court was an independent tribunal established under Article I of the Constitution and not an arm of the Defense Department. See *infra*. A year later, when another, legislative matter regarding the court was raised, the Senate Armed Services Committee reemphasized that "[t]he command structure in the military presents a possibility of undue prejudicial command influence that is not present in civilian life." S.Rep. No. 1601, 90th Cong., 2d Sess. 4 (1968).

**31.** One writer concluded, "Experience has shown . . . that the Court of Military Appeals is a decidedly weak court in eliminating command influence in military trials. Military commanders have openly overridden the law in this regard, and there is no assurance that they will not do so in the future. The longstanding refusal of military commanders to submit to the rule of law established by Congress for the operation of military courts reflects a serious loss of control over military leaders by Congress." West, *supra*, at 153.

**32.** It is noteworthy that the court's budget included a line item for a court executive post at GS–17. This budget item was approved by Congress for fiscal years 1978–81.

**33.** The defendants attempt to draw too much from Congress's failure to pass an amendment to § 867, proposed in 1980, that would have deleted the sentence regarding the court's loca-

Court, DOD clearly violated this congressional command by obstructing Mundy's promotion. Its officials were informed that the department's inaction was causing friction within the court's staff, impeding effective management and preventing the court from "fulfilling its statutory duties." Yet its officials persisted. Then, when the formation of the SES presented a new opportunity to the court properly to execute its 1976 reorganization, the Defense Department stymied that attempt as well by failing to distribute the proper forms and otherwise to process Mundy's inclusion in the SES. It cannot be said with certainty that the Civil Service Commission would have granted the Whitten Act waiver had the Defense Department forwarded the chief judge's request.[34] But even if it had not, Mundy could have advanced one grade, to GS–16, and in one year's time would have been eligible for advancement to GS–17 consistent with the Whitten Act's terms. At either GS–16 or GS–17 Mundy would

have been eligible for the SES and conversion would have been nearly automatic given OPM's endorsement of the Court Executive's inclusion in the SES. In contrast, DOD's obstructionist actions held up all processing of promotions for Mundy such that he was eventually foreclosed from the SES by various "Catch-22" technicalities.

 Alternatively, it is also clear that all necessary steps had been taken for Mundy's inclusion within the SES save a ministerial act. See *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 156, 2 L.Ed. 60 (1803). OPM allotted two spots for the Court, dispensed two sets of forms, and the Court presented Mundy with an offer to join, which he accepted. Congress had approved the relevant line item of a Court Executive at GS–17. All that stood in the way of the promotion's becoming an endorsement by the Secretary of Defense,[35] a ministerial act.[36] Thus, plaintiff is entitled to back pay representing the difference between GS–15

tion in the Defense Department. Providing "independent status for the Court" was one of five provisions contained in the proposed Court of Military Appeals Act of 1980 (H.R. 8188). The accompanying report from the House Committee on Armed Services explained that "[h]aving the highest Court of the military appellate process attached to the Department of Defense presents perception that detracts from the Court's role as a neutral tribunal." H.Rep. No. 1412, 96th Cong., 2d Sess. (1980) at 2. The House passed the bill in October, 1980. It was then referred to the Senate Committee on Armed Services on November 12, 1980. There, it appears that one of its provisions, lengthening the terms of judges appointed to the court to fill mid-term vacancies, was inserted into a separate bill covering special pay for military members. This separate bill passed both houses and became law on December 23, 1980. P.L. 96–579, 94 Stat. 3369 (1980). The remaining four provisions of H.R. 8188 were not reported out of the Senate committee before the 96th Congress ended in mid-December. The Court has not found, nor have the parties supplied, any legislative history explaining the Senate's inaction on the "independent status" provision, but it would be incorrect to infer from this inaction that Congress wished to rein in the court as to restrict its independence. There are, of course, many reasons why the Congress sometimes does not act—some of them substantive, others political, still others procedural. Indeed, in the report that accompanied the bill that did become law, the Senate Committee on Armed Services referred to the Court of

Military Appeals as on equal footing with the Tax Court, "another Article I court." S.Rep. No. 1051, 96th Cong., 2d Sess. (1980) at 8–9, U.S.Code Cong. & Admin.News, p. 6963. Finally, the instant decision would not effect the same result the bill would have accomplished. The decision does not lift the court out of the Defense Department. The Court is merely construing an existing statute to determine the rights and duties that the statute established.

34. In fact, an affidavit submitted with the government's memorandum opines that the waiver would not have been granted.

35. Mundy asserts that OPM unlawfully delegated the SES appointment power to the Secretary of Defense and that it was obliged to delegate it to the Chief Judge. The statute permits delegations only to "the heads of agencies in the executive branch," 5 U.S.C. § 1104(a)(2). The CMA is not an agency. See 5 U.S.C. § 5102(a). Consequently Mundy's position is incorrect, he has no legitimate complaint against OPM, and the action against defendant Campbell, the Director of OPM, will be dismissed.

36. An appointment to a federal job takes place upon an individual's notification that he or she has been unconditionally selected for federal employment, and the completion of a certain personnel form is merely a ministerial act. *National Treasury Employee's Union v. Reagan,* 663 F.2d 239, 243 (D.C.Cir.1981). So, too, did plaintiff's promotion take place upon the mak-

and GS–17 from July 13, 1979—the effective date of the SES—to May 30, 1981, the day he resigned.[37]

In a sense, it is not merely a civilian-military conflict that underscores the present controversy, but also one of separation of powers between the legislative and executive branches. The Court of Military Appeals is a creation of Congress while the Defense Department is a direct arm of the Executive. In the instant case, executive officials have affected in the most direct way the salary and tenure of the court's highest nonjudicial employee. One would have to be naive not to conclude that, if advancement and tenure of the highest CMA employees depended essentially on DOD outsiders, rather than on the judges of the court they serve, there are bound to be, at a minimum, conflicting loyalties: the Court Executive, the Clerk of the Court, and similar officers are likely to look over their shoulders at the DOD officials when confronted with issues—arising by way of decision or advice to the judges—which might anger these outside officials. As the Supreme Court observed, "it is quite evident that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will." *Humphrey's Executor v. United States,* 295 U.S. 602, 629, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1934).

■ It is of course for reasons such as these that federal judges are given lifetime

---

ing of an offer by one entitled to make it, the offer's acceptance, and its authorization by Congress.

The plaintiffs in *NTEU* were denied relief because they were not yet federal "employees" within the meaning of 5 U.S.C. § 2105(a), and therefore were not entitled to the statutory protections available to federal employees. Mundy, who was a federal employee, did not face this barrier.

**37.** In his constitutional claims, Mundy contends that DOD officials obstructed his promotion in retaliation for his criticism of DOD policies. Although at least one District Court has held that a cause of action implied under the Constitution is available to a federal employee who complains of administrative retaliation for the exercise of First Amendment rights, see *McAnaw v. Custis,* No. 81–4137 (D.Kan. Jan. 15, 1982), the question is not free from doubt. See, *e.g., Avitzur v. Davidson,* 549 F.Supp. 399 (N.D.N.Y.1982). Whether *Bivens v. Six Unknown Named Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), ought to be extended to cover a federal employee suing the federal government *qua* employer may be decided by the Supreme Court in *Bush v. Lucas,* 647 F.2d 573 (5th Cir.1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 3481, 73 L.Ed.2d 1365 (1982). Moreover, to let Mundy proceed on a *Bivens* theory is arguably to place him on a different footing from other federal employees. He was not required to exhaust his administrative remedies because 10 U.S.C. § 867 afforded him a distinct and independent route into this court. If he were also afforded a *Bivens* remedy, he would have two routes to federal court where other federal employees might well have none. There are "special factors counselling hesitation" in the creation of a *Bivens* remedy. *Carlson v. Green,*

446 U.S. 14, 18, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 (1980). Finally, a *Bivens* remedy should not be entertained when "Congress has provided an alternate remedy which it explicitly declared to be [an equally effective] substitute for recovery directly under the Constitution." *Carlson, supra,* 446 U.S. at 18–19, 100 S.Ct. at 1471–72. Plaintiff has a statutory cause of action that affords him damages in the form of back pay. It would therefore be overly formalistic and unreasonable to insist that a *Bivens* remedy also be provided because the availability of a cause of action under § 867 has not been "explicitly declared" by Congress to be a substitute for recovery under the Constitution.

Mundy's claim under 42 U.S.C. § 1985(3) may be addressed even more summarily. Assuming *arguendo* that the actions of the DOD officials rose to the level of a conspiracy, Mundy has failed to allege that there was "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Brechenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). The class Mundy proposes is a purported "class of individuals who are critical of DOD policies." Even if Mundy could show that such a class existed and that he was one of its members, this is not the sort of class protected by § 1985. As the Court of Appeals for the Ninth Circuit has stated, "the class status providing the motivating animus must be created by a fact other than possession of the right deprived." *Lopez v. Arrowhead,* 523 F.2d 924, 928 (9th Cir.1975). See also *Scott v. Moore,* 680 F.2d 979 (5th Cir.1982) ("Members of the plaintiff class must share some common characteristic beyond simply being victims of the defendant's conspiratorial conduct.")

824

appointments and fixed salaries,[38] that employees of courts are generally subject to autonomous employment systems,[39] and that court budgets are insulated, insofar as possible, from executive change.[40] Although the Court of Military Appeals is an Article I court, not one established under Article III, it is a body created by Congress to perform inherently judicial functions. Executive encroachment on the judicial power is to be no more permitted when that power is being exercised by an Article I tribunal than by one created under Article III.

What the Court holds today should be no more surprising than the observation that it is human nature not to bite the hand that feeds. Congress wanted a military court of last resort composed of civilians who could administer the military code evenhandedly, free from command influence. Objectivity cannot last long, however, when the very people being judged by the court are in turn judging the court and its personnel. Our notions of separation of power simply will not tolerate such encroachment by officials over a tribunal that Congress intended to be independent, and they certainly do not countenance it when the department involved has a history of command interference with quasi-judicial bodies.

38. U.S. Constitution, Art. III.

39. The Administrative Office of U.S. Courts, for example, answers to the Supreme Court and the Judicial Conference. See 28 U.S.C. §§ 601, 604. See also D.C.Code § 11–1701–1703.

40. See, e.g., 28 U.S.C. § 605; 31 U.S.C. § 11(a)(5); D.C.Code § 11–1701.