**Rena BROWN, et al., Plaintiffs,**

v.

**ARTERY ORGANIZATION, INC., et al., Defendants.**

**Civ. A. No. 86–3285.**

United States District Court, District of Columbia.

Feb. 24, 1987.

Clare L. McCulla, Ann C. Suhler, Richard A. Miller, Legal Services of Northern Virginia, Alexandria, Va., Florence Wagman Roisman, Christopher W. Hornig, National Housing Law Project, David Alan Nall, Mercedes Marquez, Georgetown University Law Center, Institute for Public Representation, Washington, D.C., for plaintiffs.

John P. Corrado, Thomas & Fiske, Washington, D.C., David G. Fiske, Anthony W. Hawks, Thomas & Fiske, Alexandria, Va., for defendants Artery Organization, Inc., Dominion Gardens Arlandria Ltd. Partnership, Henry H. Goldberg, Alan Geller, and Jack I. Luria (Artery defendants or Artery).

Richard O. Duvall, Robert P. Trout, Steven D. Gordon, Valerie Ann Lee, Dunnells, Duvall, Bennett & Porter, Washington, D.C., for defendants Conrad Cafritz, Jr., John K. Freeman, TIG–RFA, Inc., Potomac Village Ltd. Partnership, and Potomac Real Estate Group, Inc. (Cafritz defendants or Cafritz).

John P. Hume, Kenneth P. Troccoli, Krooth & Altman, Washington, D.C., for defendants ABG Financial Services, Inc., and Patrician Mortg. Co.

Robert E.L. Eaton, Jr., Asst. U.S. Atty., Washington, D.C., for Federal defendants; Patricia Sharin Flagg, Office of General Counsel, U.S. Dept. of Housing and Urban Development, Washington, D.C., of counsel.

## OPINION

HAROLD H. GREENE, District Judge.

The Fair Housing Act (42 U.S.C. §§ 3601 *et seq.*) prohibits discrimination with, respect to housing, *inter alia,* on the basis of race or national origin. The most basic substantive issue involved in this case—one of first impression in this Circuit—is whether under the Act the overwhelmingly black and Hispanic tenants of a low-rent apartment complex have the right to secure injunctive relief against the conversion of such housing to high-rent units if they are able to establish that (1) the owners are engaging in the conversion for the purpose of displacing the minority tenants or (2) the displacement of these tenants will be the conversion's predictable and inevitable effect. The Court previously issued a short-term temporary restraining order against the threatened eviction of the tenants,[1] and the dispute is now here on a more substantial basis under the rubric of plaintiffs' application for a preliminary injunction and defendants' motions to dismiss.

### I

#### *Facts*

Plaintiffs, tenants in the Dominion Gardens and Bruce Street apartment complex-

---

1. The order was subsequently extended by agreement of the parties pending resolution by the Court of the more substantive motions discussed below. The Court heard those motions on January 27, 1987, and it advised the parties at the time that, for the benefit of both sides, it would render its decision on an expedited basis.

es[2] in Alexandria, Virginia,[3] filed this suit challenging the renovation of those complexes and the consequent displacement of its tenants, overwhelmingly black and Hispanic, as a violation of the federal Fair Housing Act. *See also* note 16, *infra.* Plaintiffs seek preliminary and permanent relief, that is, injunctions to restrain the defendants from taking any action to oust tenants who have already received 120–day eviction notices[4] and from issuing any further notices to vacate.[5] In addition, although following the institution of this action the private defendants withdrew earlier applications for co-insurance with the United States Department of Housing and Urban Development (HUD), plaintiffs also seek injunctive relief against HUD. That relief would require the Department to delete from its governing "Handbook"[6] a provision which delegates to banks and other lenders HUD's own statutory responsibility to minimize the involuntary displacement of tenants.[7]

The case is presently before the Court on the following motions: (1) plaintiffs' motion for a preliminary injunction; (2) motions to dismiss for lack of personal jurisdiction filed by defendants Artery Organization, Dominion Gardens Arlandria Limited Partnership, Henry H. Goldberg, Alan Geller, and Jack I. Luria (collectively referred to herein as the Artery defendants or Artery);[8] (3) motions to dismiss for improper venue filed by defendants Conrad Cafritz, Jr., TIG–RFA, Inc., Potomac Village Limited Partnership and Potomac Real Estate Group, Inc. (collectively referred to herein as the Cafritz defendants or Cafritz)[9] as well as by the Artery defendants, defendant ABG Financial Services, and defendant Patrician Mortgage Company; and (4) motions to dismiss for failure to state a claim upon which relief may be granted filed by the Artery defendants, the Cafritz defendants, ABG, and Patrician.[10]

The Court will address defendants' procedural motions before reaching the substantive issues raised in plaintiffs' motion for a preliminary injunction and defendants' motions to dismiss for failure to state a claim.

## II

### *Jurisdiction*

As indicated, the Artery defendants challenge the Court's jurisdiction with respect to them. That challenge will be rejected.

Personal jurisdiction is authorized by the "transacting business" clause of the D.C. long-arm statute, D.C.Code § 13–423(a)(1)

---

2. There are a total of 691 apartments in these two complexes.

3. Alexandria is part of the Washington metropolitan area.

4. The notices began to be issued on October 1, 1986, but the Court has been advised that, for one reason or another, no additional tenants will be evicted pursuant to notices prior to March 31, 1987.

5. The injunction would also restrain the defendants from issuing inspection notices, it would require them to notify all tenants that notices to vacate or for inspection are ineffective and to issue no other notices at either apartment complex without giving plaintiffs' counsel at least 72 hours prior notice, and it would bar them from taking any action which would cause or contribute to the eviction of the named plaintiffs or any other tenant at either of the two apartment complexes.

6. *See* HUD Handbook 4561.1, p. 3–3.

7. Plaintiffs also seek to enjoin ABG Financial Services, Inc. (ABG), and Patrician Mortgage Company (Patrician), from further processing any co-insurance applications relating to Dominion Gardens or the Bruce Street apartment complexes.

8. The Artery defendants, which appear to specialize in the renovation of low-rent housing at least in Virginia and Maryland, are directly involved in the ownership and development of the Dominion Gardens apartment complex.

9. The Cafritz defendants own and develop the Bruce Street apartment complex.

10. ABG and Patrician, jointly, and HUD have also filed additional motions to dismiss raising issues which pertain only to those defendants. These motions are not discussed in this Memorandum, and the Court will dispose of them after oppositions have been filed and it has had an opportunity to consider all the issues raised therein.

(1981), and it is also consistent here with notions of fair play and substantial justice embodied in the Due Process Clause of the Constitution.

In order to establish jurisdiction over the Artery defendants, none of whom is a resident of the District of Columbia, plaintiffs must demonstrate that these defendants have "transacted business" in the District within the meaning of D.C.Code § 13–423(a)(1) and that plaintiffs' claims for relief arose from specific District of Columbia transactions. *LaBrier v. A.H. Robins Co., Inc.,* 551 F.Supp. 53, 55 (D.D.C.1982); D.C.Code § 13–423(b).

It has long been established that the transacting business clause of the District's long-arm statute grants jurisdiction to the fullest extent permissible under the Due Process Clause. *See, e.g., Chase v. Pan-Pacific Broadcasting, Inc.,* 617 F.Supp. 1414, 1420 (D.D.C.1985); *Environmental Research International, Inc. v. Lockwood Greene Engineers, Inc.,* 355 A.2d 808, 810–11 (D.C.1976) (*en banc*). Moreover, as the District of Columbia Court of Appeals has noted, section 13–423(a)(1) requires only "some affirmative act by which the defendant brings itself within the jurisdiction and establishes minimum contacts." *Cohane v. Arpeja-California, Inc.,* 385 A.2d 153, 158 (D.C.Ct.App. 1978).[11]

Plaintiffs allege that the Artery defendants have "transacted business" in the District within the meaning of the D.C. long-arm statute on the basis both of its direct contacts with the District and of the indirect contacts imputed to it as a result of its constructive agency or co-venturer relationship with Cafritz.[12] The Artery defendants claim in response that personal jurisdiction cannot be premised either upon their direct contacts with the District because the so-called "government contacts" doctrine pre-cludes consideration of some or most of those contacts, or upon the contacts of the Cafritz defendants with the District because Artery and Cafritz had merely an arm's length, buyer-seller relationship, not a co-venturer relationship, with each other.

■ The Court has concluded that the contacts of the Artery defendants with the District of Columbia, directly and through the Cafritz defendants, are fully adequate to establish jurisdiction under the "transacting business" clause of the D.C. long-arm statute.

Artery's direct forum contacts include the following: (1) some of the negotiations for, and the settlement of, the assignment of the Dominion Gardens purchase contract from Cafritz to Artery took place in the District of Columbia; (2) a meeting between Michael McGinn of Artery and John Freeman of Cafritz occurred at Freeman's house in the District of Columbia, McGinn delivered a draft Assignment Agreement there, and the two there also discussed the Dominion Gardens project as well as the transfer of 152 units to the Alexandria Redevelopment Housing Authority for maintenance as low-income housing; (3) a meeting was held at the Riggs Bank in the District of Columbia between tenant representatives and Artery, at which Artery declined to sell Dominion Gardens to the tenants; (4) Artery hired ABG, Patrician, and Krooth & Altman, all District of Columbia firms, as its agents to arrange HUD mortgage co-insurance for Dominion Gardens; and (5) Artery applied in the District (through its D.C. agents ABG, Patrician, and Krooth & Altman) to HUD for mortgage co-insurance.

■ To be sure, one of these contacts— Artery's application to HUD for mortgage co-insurance—properly falls within the purview of the government contacts doctrine.

---

**11.** It is axiomatic, of course, that these contacts must represent a deliberate and voluntary association with the forum, and that they must be of a quantity and quality sufficient to demonstrate a purpose to obtain the benefits and protections of the forum. *Chrysler Corp. v. General Motors Corp.,* 589 F.Supp. 1182, 1205 (D.D.C.1984).

**12.** This relationship is said to have been established by Artery's and Cafritz's concerted plan to acquire and rehabilitate the Dominion Gardens and Bruce Street apartment complexes. *See also* Part III, *infra.*

That doctrine of course precludes from consideration for jurisdictional purposes contacts with the federal government in the District of Columbia, *Mueller Brass Co. v. Alexander Milburn Co.*, 152 F.2d 142 (D.C. Cir.1945), on the basis of "the unique character of the District as the seat of national government and in the correlative need for unfettered access to federal departments and agencies for the entire national citizenry." *Environmental Research*, 355 A.2d at 813; *Coalition on Sensible Transportation, Inc. v. Dole*, 631 F.Supp. 1382, 1385 (D.D.C.1986); *Siam Kraft Paper Company, Ltd. v. Parsons & Whittemore, Inc.*, 400 F.Supp. 810 (D.D.C.1975). However, that reasoning does not apply to any of the other direct contacts of Artery with the District of Columbia.

Artery claims that its engagement of ABG, Patrician, and Krooth & Altman incident to the HUD application is in the same category as the HUD application itself. But it is clear that the transaction of business in the District of Columbia between a principal and its agent is itself jurisdictionally significant, even though the contacts between either or both of them and the government are excludable under the government contacts doctrine. *See Chase*, 617 F.Supp. at 1427. Beyond that, Artery's remaining forum contacts do not involve the government at all; they pertain to the negotiation, creation, and settlement of binding legal obligations out of which plaintiffs' claims arise. These direct contacts, in addition to the direct forum contacts resulting from Artery's engagement of ABG, Patrician, and Krooth & Altman alone support the existence of personal jurisdiction over Artery in this Court.

 This finding of personal jurisdiction is strengthened by Artery's indirect forum contacts, imputed to it as a result of its relationship with Cafritz.[13] The D.C. long-arm statute recognizes that jurisdiction may be predicated upon the acts of an agent as well as those of the principal, and that such an agency may be created expressly or constructively, by a co-venturing or a conspiratorial relationship. *Mandelkorn v. Patrick*, 359 F.Supp. 692, 696 (D.D.C.1973).

Upon the facts as they are before this Court, the conclusion is inescapable that Cafritz and Artery embarked on a concerted venture to rehabilitate Dominion Gardens and Bruce Street, and that they consistently coordinated their efforts in such a manner that an agency or co-venturer relationship exists between them.

Cafritz initially executed contracts for various portions of the Layton Estate, the situs of both the Dominion Gardens and the Bruce Street apartment complexes. Thereafter, it refused to entertain tenant offers for either apartment complex, instead assigning the Dominion Gardens purchase contract to Artery. In order for Artery to close on the purchase of Dominion Gardens, Cafritz arranged for and guaranteed an interim loan of $12,150,000, while taking back $150,000 in short-term financing, and it paid all but one-half point in loan fees. Cafritz acquired a one per cent limited partnership interest in the Artery ownership entity and a one hundred per cent security interest in the remaining partnership interests. Cafritz and Artery agreed as to the schedule for eviction and construction the latter should follow, and Cafritz agreed to make good faith efforts to obtain a dispensation from the Layton Estate to begin the emptying of the entire property before closing.

Artery and Cafritz also pursued identical financing strategies: both engaged ABG and Patrician to seek federally-assisted financing. While negotiating the Dominion Gardens deal, Artery and Cafritz agreed that Cafritz would transfer certain other Arlandria properties to the Alexandria Redevelopment Housing Authority for maintenance as low-income housing. Finally, Artery has publicly claimed credit with Cafritz for maintaining these units as low-income housing.

All these connections between Artery and Cafritz clearly establish the existence

**13.** The Cafritz defendants are plainly and unambiguously residents of the District of Columbia.

of a constructive agency or co-venturer relationship between them, and Cafritz's innumerable forum contacts may therefore be imputed to Artery.

The Court concludes that Artery's direct contacts with the District, and its indirect contacts, imputed as a result of its relationship with Cafritz, are sufficient to bring Artery within the purview of the D.C. long-arm statute, and that personal jurisdiction over Artery in this Court is thus fully established.

### III

### *Venue*

For federal question cases, venue is proper in the judicial district where all the defendants reside or the district in which the claim arose. 28 U.S.C. § 1391(b). Venue in this district cannot be predicated in this case upon residence since not all the defendants reside here: Artery is neither incorporated nor licensed to do business in the District of Columbia. *See* 28 U.S.C. § 1391(c). Thus, venue is proper in the District only if it is determined, after a "common sense appraisal" of the operative events in this case, that the cause of action arose here. *Mundy v. Weinberger*, 554 F.Supp. 811, 818 (D.D.C.1982) (*citing Lamont v. Haig*, 590 F.2d 1124, 1134 (D.C.Cir. 1978)). "Venue is proper if the activities that transpired in the forum district were not insubstantial in relation to the totality of events giving rise to plaintiff's grievance and if the forum is generally convenient for all litigants." *Id.* at 818 (citation omitted). An appraisal based on these criteria leads the Court to the conclusion that the cause of action did, in fact, arise in the District of Columbia.

■ The acts occurring in the District are "not insubstantial in relation to totality of events giving rise to plaintiffs' grievance." *See* 554 F.Supp. at 818. These acts include what for present purposes are two significant sets of facts: (1) the negotiation for and settlement of the assignment of the Dominion Gardens purchase contract from Cafritz to Artery, and (2) the discussion,

negotiation, and formulation of the plans to rehabilitate the two apartment complexes. It is thus reasonable to conclude on the present record, and the Court does conclude, that the conversions of Dominion Gardens and of Bruce Street, with all of the implications of those conversions for this lawsuit, were planned, both in concept and with respect to significant details, in the District of Columbia. Nor is it at all surprising that these events should have occurred here since Cafritz, by far the dominant partner, is firmly located in the District, and since HUD, at one time thought to be an essential ingredient in the transactions, is likewise located here.

While the effects of the rehabilitation plans will be felt primarily in Virginia, to hold that the negotiation for and settlement of the assignment of the Dominion Gardens purchase contract, and the formulation and negotiation of the rehabilitation plans, are insubstantial in relation to the totality of events giving rise to plaintiffs' claim would be placing the cart before the horse. Particularly if it turns out that the discrimination was intentional (*see* Part IV, *infra*), the place where that intent was formulated or evidenced may well become the crux of the lawsuit. In any event, without the formulation of the rehabilitation plans the two apartment complexes would not be undergoing rehabilitation, and consequently plaintiffs would have no basis for alleging intentional discrimination or discriminatory effects occurring in Virginia. The Court concludes on the basis of these facts that the activities in the District of Columbia constitute events having high operative significance for venue purposes, and that venue is therefore proper here.

■ The conclusion that venue is appropriate in this district does not necessarily preclude the possibility that venue may also be proper in the Eastern District of Virginia, that is, that the events transpiring in the Eastern District of Virginia also may be of operative significance. Venue may be proper, albeit rarely so, in two judicial districts. *Leroy v. Great Western United Corp.*, 443 U.S. 173, 184–85, 99

S.Ct. 2710, 2716–17, 61 L.Ed.2d 464 (1979); *Akbar v. New York Magazine Co.*, 490 F.Supp. 60, 66–68 (D.D.C.1980). In such circumstances, if plaintiffs' choice of forum is convenient to defendants, and the witnesses and evidence are easily accessible there, the court should defer to plaintiffs' choice of forum. *See Texas Estern Transmission Corp. v. Marine Office-Appleton & Cox Corp.*, 579 F.2d 561, 567 (10th Cir. 1978); *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir.1970); *Cooper v. Camp Pinecrest, Inc.*, 175 F.Supp. 817, 818 (D.C. N.Y.1959).

In this case, the District of Columbia is clearly a convenient forum for all parties, including the defendants. The Cafritz defendants, ABG, and Patrician [14] are residents of the District of Columbia. The Artery defendants, residents of Virginia and Maryland, are within a short commute of the District of Columbia, as evidenced by, among other things, their frequent visits to the District, for conferences and otherwise.

The witnesses and the evidence are likewise easily accessible in the District of Columbia. It appears from the nature of this case that all or almost all the witnesses to be called at trial will reside in the District of Columbia or in the suburban Washington area. Similarly, there should be minimal difficulty in presenting the documentary evidence here since, as the Court judicially knows, the distance between Alexandria and the courthouse in which this Court sits, is but a few miles.[15]

After a "common sense appraisal" of the events having operating significance in this case and the policies underlying venue, the Court concludes that venue is proper in the District of Columbia. Accordingly, defendants' motion to dismiss for lack of venue will be denied.

## IV

### *Framework for Substantive Decision*

Plaintiffs' motion for a preliminary injunction alleges violations of the Fair Housing Act.[16] It requests a number of specific injunctions against defendants Dominion Gardens Arlandria Limited Partnership and Potomac Village Limited Partnership,[17] and it further requests that all the private defendants be enjoined from taking any action which would cause or contribute to the eviction of plaintiffs.[18] Defendants oppose plaintiffs' motion primarily on the ground that plaintiffs have not satisfied their burdens under the Fair Housing Act, in that they have not established discriminatory intent or adverse effect, and their motions to dismiss for failure to state a claim upon which relief may be granted proceed on the

---

**14.** Cafritz, ABG, and Patrician have their respective principal places of business in the District of Columbia. Cafritz is a large realty company with innumerable ties to the District.

**15.** That distance may be no more than that between the courthouse and the Cafritz offices in the District of Columbia itself.

**16.** Plaintiffs also rely upon 42 U.S.C. § 1982. In view of the Court's rulings on the Fair Housing Act claim (*see infra*), it need not at this juncture discuss plaintiffs' section 1982 claim, but it may of course consider that claim at a later date.

**17.** Specifically, defendants are sought to be enjoined (1) from issuing any additional 120–day notices to vacate or inspection notices; (2) from taking any action to evict tenants who have already received 120–day notices to vacate; (3) from taking any action to evict tenants based on inspections carried out pursuant to the notices posted by these defendants; (4) to notify all tenants that the inspection notices posted and 120–day eviction notices issued by these defendants are invalid and ineffective; (5) to issue or post no other notices at Dominion Gardens or Bruce Street without giving the plaintiffs' counsel at least 72 hours prior notice; and (6) from taking any action with the purpose or effect of intimidating or of limiting the access of plaintiffs or their representatives to the premises at Dominion Gardens or Bruce Street.

**18.** While the relief requested by plaintiffs is broadly worded to encompass all tenants at the two complexes, only a limited number of tenants are listed as plaintiffs herein. On this basis, the Court's Order (*see* below) relates only to these named plaintiffs. If other tenants of Dominion Gardens or Bruce Street seek similar protection, they will either have to join this lawsuit or plaintiffs will have to request, and they will have to be granted, class certification on the basis of principles generally applicable to such certifications.

basis of substantially similar arguments. Since the issues raised with respect to the two principal substantive motions thus overlap to a significant degree, this part of the Opinion discusses both motions within the framework of analysis for the preliminary injunction motion.

■ Under familiar principles, in determining whether to grant a preliminary injunction, the Court is required to consider four factors: (1) whether there is a substantial likelihood that plaintiffs will prevail on the merits; (2) whether plaintiffs will be irreparably injured if the injunction does not issue; (3) the hardship to defendants if the injunction is granted is balanced against the hardship to plaintiffs if the injunction is not granted; and (4) whether the public interest favors granting the preliminary relief requested. *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*, 259 F.2d 921, 925 (D.C.Cir. 1958). Plaintiffs are not required to prevail on each of these factors; rather the factors should be viewed as a continuum—more of one factor compensating for less of another. Preliminary injunctive relief, therefore, would not be precluded, for example, by a relatively weak showing of likelihood of success on the merits if the plaintiffs demonstrated that the other three factors weighed strongly in their favor. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843–44 (D.C.Cir.1977); *Massachusetts Law Reform Institute v. Legal Services Corp.*, 581 F.Supp. 1179, 1184 (D.D.C.1984), *aff'd*, 737 F.2d 1206 (D.C.Cir.1984).[19] It is with these standards in mind that the Court examines the motions and the issues they present.

## V

### Precedents on Housing Discrimination

As indicated above, the Fair Housing Act prohibits public and private discrimination in housing on the basis of race or national origin. A central issue here, as in several other cases which have come before the federal courts in various parts of the country, is whether the Act requires proof of the landlord's intentional discrimination, or whether the statute is violated also where no such intention is established but where the conduct can be shown to have a discriminatory effect.

The answer to that question is unfortunately not entirely clear from a reading of the decided cases. Several of the decisions are inconsistent with each other; others are incomplete in significant respects; and still others do not distinguish between the various relevant concepts. While, to be sure, proof of discriminatory intent by the landlord seems everywhere to be regarded as establishing a violation of the statute, *see Betsey v. Turtle Creek Associates*, 736 F.2d 983, 986 (4th Cir.1984), there is a variety of opinion, usually not reconciled in any systematic fashion, whether a violation may also be predicated solely upon proof that the landlord's actions had a discriminatory effect, that is, a disproportionate effect on minorities.

Some of the decisions hold, or at least intimate, that evidence of discriminatory effect is alone sufficient to establish a *prima facie* case under the Act. *See, e.g., Betsey*, 736 F.2d at 986; *Metropolitan Housing Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290–91 (7th Cir. 1977) (hereinafter referred to as *Arlington II*); *Residents Advisory Board v. Rizzo*, 564 F.2d 126, 147–48 (3d Cir.1977); *United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1184–85 (8th Cir.1974). Other decisions—sometimes the same decisions— suggest that effect by itself is never enough; that there must also be a showing that the private landowner intended to discriminate. *See generally Betsey, supra; Arlington, II, supra.*

To complicate matters further, of the cases holding that proof of discriminatory

---

**19.** Several other Circuits have adopted a similarly flexible approach to determinations on motions for preliminary injunctions. *See, e.g., Benda v. Grand Lodge of International Ass'n*, 584 F.2d 308, 314–15 (9th Cir.1978); *Blackwelder* *Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 193–96 (4th Cir.1977); *Charlie's Girls v. Revlon, Inc.,* 483 F.2d 953, 954 (2d Cir.1973) (per curiam).

effect is alone sufficient, several distinguish between two types of effect: what has been called adverse impact discrimination and what is termed ultimate effect discrimination. *See, e.g., Arlington II*, 558 F.2d at 1290–91. Adverse impact discrimination is said to be established when the practice or policy in question has a disproportionate effect upon the minorities within the group to which the policy is applied (*e.g.*, the tenants in a particular apartment complex). *Id.; see Betsey*, 736 F.2d at 987–88. Ultimate effect discrimination, on the other hand, focuses upon a different pool: the entire population of a particular community. As the court phrased it in *Arlington II*, 558 F.2d at 1290, a violation of the Act will be found if the decision or policy in question "perpetuates segregation [in the community] and thereby prevents interracial association ..." [20]

Moreover, in some of the cases involving allegations of ultimate effect discrimination, liability under the Fair Housing Act appears to depend upon whether the defendant is a governmental body or a private entity, suggesting that proof of discriminatory effect alone (without proof of discriminatory intent) is enough only when the defendant is a governmental body. Indeed, the "ultimate effect" decisions generally involve governmental defendants, *see, e.g., Rizzo*, 564 F.2d at 149; *Black Jack*, 508 F.2d at 1184–85, and some of them explicitly hold that an action against a private landlord cannot be premised upon allegations of ultimate effect discrimination. *See, e.g., Boyd v. Lefrak Organization*, 509 F.2d 1110 (2d Cir.1975); *Dreher v. Rana Management, Inc.*, 493 F.Supp. 930 (E.D.N.Y.1980).

## VI

### *Rules to be Applied*

The Court of Appeals for this Circuit has never had occasion to decide these issues, and this Court is thus not bound by any particular rule.[21] After analyzing the decisions elsewhere, and after considering the theoretical underpinnings of the various holdings, this Court has decided that it will apply the following set of rules.

■ A. If the defendant is a governmental body, proof of discriminatory impact of its actions on the community for which it serves suffices to establish a *prima facie* case of violation of the Fair Housing Act. It is unclear from the decided cases whether the governmental body involved can overcome that *prima facie* case by proof of a neutral or positive purpose or whether, in view of the objectives of the Fair Housing Act, the perpetuation of racial segregation or other discrimination by government must be regarded as so pernicious that evidence of a benign intent will not save the activity. Since, in the present posture at least, this case does not present that issue,[22] its resolution may properly be left to another day or another court.

■ B. If the defendant is not a governmental body, the plaintiff-tenants will be deemed not to have proved a violation of the Fair Housing Act if they demonstrate no more than that the defendant's actions have had or will have a discriminatory effect or impact: some proof of discriminatory intent (*see infra*) is necessary. The reasons for this conclusion are as simple and straightforward as they are significant.

While it makes perfect sense to charge a governmental entity with violations of the statute if its actions—by way of regulations, ordinances, zoning decisions, or the like—have the effect of fostering or perpetuating racial segregation, there is no indication that the Congress had in mind the

---

**20.** The court went on to note that it would consider "the extent to which it produces a disparate effect on different racial groups." *Id.*

**21.** In fact, none of the parties has cited the Court to any District Court decision in this district.

**22.** There is still a question whether HUD will remain a defendant herein. Moreover, discovery could conceivably implicate other governmental entities.

far-reaching consequences of the application of such a rule on private landlords or developers. A rule which imposed the burden of responsibility on such individuals or entities for the racial effects of their housing conversions *irrespective of their purpose or intent* would not only render them responsible for consequences over which they have no control (*e.g.,* the racial mix in the community as a whole);[23] but for the reasons cited below, it would also be likely to halt in their tracks most, if not all, private efforts to upgrade deteriorated housing stock in many of the large cities of this nation. The perpetuation and the spread of the resulting blight is not in the public interest, and plaintiffs have cited no evidence that it represents an objective of the Fair Housing Act.

It is an unfortunate fact, for which individual private landowners have no more responsibility than any other member of the community, that the income of a disproportionate number of blacks and members of other minority groups[24] is such that, although they are able to afford low income housing, many cannot afford the rentals being charged for upgraded or luxury housing. As a consequence, if a disproportionate effect or impact on minorities were alone sufficient to call for injunctive relief under the statute, the inhabitants of low-rent private housing largely populated by minorities would be entitled on this basis to judicial orders halting the upgrading or conversion of such housing in all or almost all circumstances. That, as indicated, is not what Congress intended.

■ C. For these reasons, it is the Court's conclusion that the Act, properly construed, also requires proof of discriminatory intent. The question is—what degree of proof? Defendants suggest that such proof must be direct and convincing, and that, absent evidence of defendant expressions of racial animus or their equivalent, the complaint must be dismissed. That position is as faulty in its way as plaintiffs' claim that intent or purpose are irrelevant.

In the view of this Court, the correct standard is that alluded to by the Seventh Circuit in *Arlington II* and by the Fourth Circuit in *Smith*—that the extent of the proof of discriminatory intent required varies with the proof of discriminatory effect adduced; the more devastating to minorities the effect or impact of the landlord's actions, the less evidence will be required of his actual intentions.[25] That is only common sense: if the impact of particular actions falls overwhelmingly on minorities, it is not unreasonable to regard that circumstance as some evidence, at least *prima facie*, that discrimination was the intended result. To put it another way, discrete evidence of discriminatory purpose is not as critical in that situation as when the impact of a landowner's actions falls alike, or more or less alike, on both minorities and non-minorities.

---

**23.** That does not mean that the availability or non-availability in the community of alternative housing opportunities for the affected minorities is not a factor to be taken into account, together with other effects or impacts when suit is brought against private developers or landlords. It means only that community-wide conditions and impacts do not suffice, in the context of an action against a private developer or landlord, to allow plaintiff to carry his burden of proof.

**24.** *E.g.,* Hispanics.

**25.** In *Arlington II,* the Seventh Circuit adopted a four-part test, as follows:
(1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis,* [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ] (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.
558 F.2d at 1290; *see Smith v. Town of Clarkton,* 682 F.2d 1055, 1065 (4th Cir.1982). The third factor is being considered herein (*see infra*), and the fourth appears to apply primarily to governmental action.

To be sure, for the reasons discussed above, a plaintiff must still offer some evidence of discriminatory intent in addition to the "effects" proof, but once such evidence, direct or circumstantial,[26] has been produced, the burden falls properly upon the defendant to demonstrate that his decision was not the product in any way of racial purpose or motive.

D. Thus, the requirements of discriminatory effect and intent should be viewed from a single perspective: the more overwhelming the proof of discriminatory effect, the less the showing of discriminatory intent that is required to establish a violation of the Fair Housing Act, and vice versa. However, in every action brought against private parties under the Act, plaintiffs must allege and offer some proof of discriminatory intent in addition to the deduction that may be made from the effects of the defendant's actions.

## VII

### *Application of the Principles to this Case*

█ How do these general principles find applicability here on the basis of the present record? Plaintiffs have offered extensive proof of discriminatory effect. According to them, virtually all the tenants at the Bruce Street apartments and ninety per cent of the tenants at Dominion Gardens are members of minority groups, either black or Hispanic. As a consequence of the planned rehabilitation of the Dominion Gardens and Bruce Street apartment complexes, all of the tenants of those complexes will be evicted, and the vast majority of the 2,000 or so minority tenants will be foreclosed, according to plaintiffs' allegations, from obtaining affordable housing either in the rehabilitated complexes or elsewhere in the City of Alexandria. This will be so, say the plaintiffs, because of the combination of a low vacancy rate in Alex-

andria (1.7 per cent); high rents for available apartments (including those at Dominion Gardens and Bruce Street when rehabilitation is completed); and the continued existence of race discrimination in Alexandria, as evidenced by a statistical study compiled in September 1986. *See* Regional Fair Housing Consortium, *Race Discrimination in the Rental Housing Market: A Study of the Greater Washington Area* at 6 (September 29, 1986). Plaintiffs also allege, with supporting affidavits, that the displacement of these 2,000 minority tenants will significantly reduce the minority population of the City of Alexandria. In sum, according to plaintiffs, such progress as may have been made in recent times with respect to the inclusion of significant numbers of blacks and other minorities in the Alexandria population will largely be wiped out: that city will, once again, be essentially lily-white.

In contrast to plaintiffs' showing of a disproportionate effect of defendants' actions on blacks and Hispanics, their proof of discriminatory intent is not strong. They have offered no direct evidence at all of such intent. In fact, defendants vigorously assert that their objectives and interests are purely economic. However, plaintiffs have alleged, and to some degree proved, the existence of circumstances from which a trier of fact could eventually find discriminatory purpose if additional evidence of such purpose were adduced. Thus, plaintiffs allege that defendants knew, or should have known, that their actions would result overwhelmingly in the displacement of blacks and Hispanics both from the two apartment complexes directly involved and from the City of Alexandria itself. The Cafritz defendants have been intimately involved in the rehabilitation of at least one other apartment complex in Alexandria occupied primarily by minority tenants, and that rehabilitation resulted in

---

**26.** In this day and age, when racial discrimination is no longer as fashionable as it was a generation or two ago, racists are more cautious than they used to be, and for that reason it is now much more difficult to provide direct or

conclusive proof of discriminatory intent. The law would be as blind as the mythical figure of justice if it did not take account of that reality, rejecting the use of circumstantial evidence of intent.

the displacement of all or most of those minority tenants.

Moreover, from the evidence presented by both parties, it appears questionable whether the relocation program established by defendants at that apartment complex, which is comparable to the programs established at Dominion Gardens and Bruce Street, was at all effective in relocating the minority tenants in Alexandria. It is not inappropriate therefore to recall the Seventh Circuit's pronouncement that "[c]onduct that has the necessary and foreseeable consequences of perpetuating segregation can be as deleterious as purposefully discriminatory conduct ..." *Arlington II*, 558 F.2d at 1289.

Beyond this proof, however, there is the fact that plaintiffs have flatly alleged that defendants acted with discriminatory intent. To be sure, allegation is not proof, and absent some proof, in addition to that recited above, to support their allegation, plaintiffs will not be able to prevail. However, in view of the present posture of this case, plaintiffs have had precious little opportunity to engage in discovery—discovery that is particularly critical where intent is the issue.

In short, while plaintiffs have not adduced adequate evidence of intent to meet their burden of proof at trial, they have sufficiently alleged intent and presented a sufficient indication that they may be able to prove that allegation, that the Court would not be justified in foreclosing them from going forward at this juncture.[27] Through discovery, plaintiffs may be able to bolster their showing in this regard. All that is required of plaintiffs at this preliminary stage, is that there be a substantial likelihood that they could succeed at trial. The Court concludes that plaintiffs have carried that burden.

In addition to supporting plaintiffs' case for a preliminary injunction, the above analysis also compels the conclusion that defendants' motions to dismiss must be denied. If there is any likelihood that plaintiffs will prevail on the merits, it cannot be said that they have failed to state a claim upon which relief may be granted.

## VIII

### *Relative Injuries*

■ Plaintiffs have clearly established that if the injunction is not issued they will be irreparably harmed. It is axiomatic that wrongful eviction constitutes irreparable injury. *Johnson v. United States Department of Agriculture*, 734 F.2d 774, 789 (11th Cir.1984); *Edwards v. Habib*, 366 F.2d 628 (D.C.Cir.1965). Indeed, plaintiffs allege that, if they are evicted, they will not be able to relocate in Alexandria due to the city's high rents and extremely low vacancy rate. Consequently, according to plaintiffs, many of them will have to attempt to relocate in new areas, find new jobs, and change schools for their children in mid-year. One significant consequence may be to force these generally low-income individuals and families to spend their limited funds and to waste long periods of time every day on transportation between their out-of-Alexandria housing and their in-Alexandria jobs. Others, it is said, will be forced to move into sub-standard housing in order to avoid homelessness. And some may wind up completely homeless. In addition, the search for new housing will itself cause plaintiffs to lose income—which is low and marginal even now—as they will have to take unpaid leave from their jobs and bear increased transportation costs.

By contrast, defendants can claim only that they *may* be harmed financially if the injunction is issued. Defendants assert that they may lose necessary long-term financing upon the issuance of a court order which had the effect of delaying the

---

**27.** The grant of the motion to dismiss would have that effect directly; the denial of a preliminary injunction would be likely to moot the controversy, and it would thus foreclose plaintiffs indirectly from having any opportunity to prove discrimination.

conversions, but little concrete support has been offered for that intrinsically not compelling speculation. They also allege, with somewhat greater justification, that the costs of rehabilitation will increase if that rehabilitation is delayed, and that even a short delay will negatively affect income from the project. These hardships, however, are not only largely speculative but they are also reparable and clearly not of the same magnitude as the injuries suffered by plaintiffs should they be wrongfully evicted. This would be so particularly if, as seems likely, plaintiffs would be able to find alternative housing only far away from Alexandria, their employment, schools, friends, and such other ties as they may have established. In short, the balance of hardships weighs heavily in favor of granting the preliminary injunction.

■ Finally, defendants claim that rehabilitation of the two apartment complexes in question will serve the public interest as it preserves the existing housing and neighborhoods. Issuance of an injunction, they argue, would create a strong disincentive for maintenance and rehabilitation programs for deteriorated housing. Defendants' arguments have obvious merit, and they cannot be dismissed lightly. However, since the early 1960s, the Congress has made eradication of discrimination in all facets of public life, including housing, a priority to which many otherwise private interests must give way.[28] Based upon that strong public policy, the Court concludes that the public interest will most readily be served if prevention of the spread of racial discrimination in housing is given priority weight. This is most appropriately accomplished if allegations of race discrimination in housing which *prima facie* have a likelihood of being meritorious, are allowed fully to be developed at trial.

## IX

### *Conclusion*

Plaintiffs have alleged that their threatened evictions from the apartment complexes in which they reside were caused by a purpose or intent to discriminate against them on account of their race or national origin. Some support for that allegation is provided by the fact that the negative impact of the actions of the developers would fall almost entirely on blacks and Hispanics, and the fact that prior renovation programs of some of these same developers had the effect of clearing, or almost clearing, members of such groups both from the apartment complexes there involved and from the City of Alexandria itself.

In view of this preliminary showing, plaintiffs are entitled to prove at trial, if they can, that the developers' actions are the products, in whole or in part, of a discriminatory intent, in which case they will have made out a case of violation of the Fair Housing Act, and they will be entitled to permanent injunctive relief. It should be clear, however, that, while the allegations and the evidence before the Court are sufficient to entitle plaintiffs to a trial and to maintenance of the status quo pending that trial,[29] that evidence will not, without more, support an ultimate judgment in plaintiffs' favor. Under the Fair Housing Act, there will have to be some additional proof, direct or circumstantial, of discriminatory intent.

An appropriate Order consistent with this Opinion is being issued herewith.

### ORDER

In accordance with the Opinion being issued contemporaneously herewith, it is this 24th day of February, 1987

ORDERED that the motions of defendants Artery Organization, Inc., Dominion

---

**28.** For example, Title II of the Civil Rights Act of 1964 prohibits discrimination with respect to the enjoyment of goods and services of places of "public accommodation." 42 U.S.C. § 2000a. Thus, the property rights of proprietors of most motels, inns, theaters, and restaurants are limit-

ed to the extent that they may not operate their establishments in a discriminatory fashion.

**29.** The Court intends to require the parties to expedite discovery in order that the trial will not be unduly delayed.

Gardens Arlandria Limited Partnership, Henry H. Goldberg, Alan Geller, Jack I. Luria, Conrad Cafritz, Jr., John K. Freeman, TIG–RFA, Inc., Potomac Village Limited Partnership, Potomac Real Estate Group, Inc., ABG Financial Services, Inc., and Patrician Mortgage Company to dismiss be and they are hereby denied; and it is further

ORDERED that plaintiffs' motion for a preliminary injunction be and it is hereby granted; and it is further

ORDERED that defendants Artery Organization, Inc., Dominion Gardens Arlandria Limited Partnership, Henry H. Goldberg, Alan Geller, Jack I. Luria, Conrad Cafritz, Jr., John K. Freeman, TIG–RFA, Inc., Potomac Village Limited Partnership, Potomac Real Estate Group, Inc., be and they are hereby enjoined, pending trial and further Order of this Court:

(1) from issuing any additional 120–day notice to vacate or inspection notices to the named plaintiffs;

(2) from taking any action to evict those named plaintiffs who have already received 120–day notices to vacate;

(3) from taking any action to evict any named plaintiff based on inspections carried out pursuant to the notices posted by these defendants;

(4) to notify the named plaintiffs that the inspection notices posted that pertain to them and the 120–day notices issued to them by these defendants are invalid and ineffective;

(5) from taking any action with the purpose or effect of intimidating, or of limiting the access of, the named plaintiffs or their representatives to the premises at the Dominion Gardens or Bruce Street apartment complexes; and

(6) to notify all the tenants at the Dominion Gardens and Bruce Street apartment complexes by a sufficient number of notices prominently posted at those two apartment complexes of the relief awarded to plaintiffs by this Order.