BCCI HOLDINGS (LUXEMBOURG), SOCIETE ANONYME, at al., Plaintiff,

v.

Abdul Raouf Hasan KHALIL, et al., Defendants.

No. Civ.A. 95–1252 (JHG).

United States District Court, District of Columbia.

Jan. 15, 1997.

Michael Nussbaum, James P. Davenport, Eric L. Lewis, A. Katherine Toomey, Stacy A. Feuer of Nussbaum & Wald, Washington, D.C., for BCCI Holdings (Luxembourg), S.A., et al.

James P. Linn, Stephen Johnson of Linn & Neville, Oklahoma City, OK, and T. Jay Bar-

rymore of Reichler, Milton & Medel, Washington, D.C., for Abdul Raouf Hasan Khalil.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Presently before the Court is Defendant Abdul Raouf Hasan Khalil's motion to dismiss. This case is one of many suits stemming from the worldwide collapse of the Bank of Credit and Commerce International ("BCCI").[1] In this case, the Court Appointed Fiduciaries[2] for BCCI have alleged that the plaintiffs suffered harm as a result of a complex multinational conspiracy involving Defendants Khalil, Akbar, Capcom Financial Services Limited ("Capcom UK"), Capcom Futures Inc. ("Capcom US") and two corrupt former BCCI executives. For the reasons stated below, the motion will be denied.

### I. Background

For the purposes of this motion to dismiss, the Court assumes true, as she must, the facts alleged in the plaintiffs' complaint. This suit has been brought on behalf of the BCCI Group by its Court Appointed Fiduciaries. On July 5, 1991, banking regulators worldwide intervened to assume control of the operations and assets of the BCCI Group. On various dates in 1992 and 1993, courts in Luxembourg and the Cayman Islands appointed liquidators for the BCCI Group entities, empowering those liquidators to sue on behalf of each entity and its creditors and depositors for the benefit of the liquidation estate. Complaint ¶¶ 19–25.

The plaintiffs have sued four defendants:

1. Defendant Abdul Raouf Hasan Khalil ("Khalil") is a citizen of Saudi Arabia, who has served as Executive Administrator to the Chief of Intelligence and as Deputy Chief of Intelligence for Saudi Arabia. *Id.* at ¶ 26. Khalil is alleged to be a current record shareholder of BCCI Holdings and to have been so since 1979. "Khalil was, in whole or in part, a nominee shareholder in BCCI Holdings, receiving non-recourse advances from plaintiffs or related companies to purchase some or all of his shares in BCCI Holdings." *Id.* The plaintiffs further allege that Khalil became a record shareholder of CCAH, the ultimate parent of First American Bankshares in 1982, and he continues to be a record shareholder today. *Id.* at ¶ 28. They allege that he held these shares as a nominee for corrupt former BCCI managers after receiving non-recourse advances to purchase the shares. Based on his nominee ownership of shares in CCAH, Khalil has been charged with violations of U.S. banking laws by the Board of Governors of the Federal Reserve.

2. Defendant Syed Ziauddin Ali Akbar ("Akbar") is a citizen of both the United Kingdom and Pakistan. *Id.* at ¶ 29. Akbar was a BCCI employee from 1976 to 1986 and served as head of the Treasury Division from 1982 to 1986. He was responsible for managing and investing BCCI's funds and he was responsible for the accounts of major BCCI customers, such as Khalil. The plaintiffs allege that Akbar controlled Capcom UK and Capcom U.S. *Id.* Akbar and Capcom UK have been indicted by grand juries in the U.S. District Court for the Middle District of Florida for money laundering, racketeering and other offenses. *Id.* at ¶ 33. When the instant complaint was filed, Akbar was incarcerated in the United Kingdom.

3. Defendant Capcom UK is a United Kingdom corporation, which was incorporated in 1984 and financed by the plaintiffs. *Id.* at ¶ 30. The plaintiffs aver that "[i]ts nominal business purpose was to engage as a broker-dealer in futures, options and commodities." *Id.* Capcom UK has been fined and suspended form certain

---

1. "BCCI", as used herein, refers collectively to BCCI Holdings (Luxembourg) S.A. ("BCCI Holdings"), its two operating subsidiaries, Bank of Credit and Commerce International S.A. ("BCCI S.A.") and Bank of Credit and Commerce International (Overseas) Limited ("BCCI Overseas"), and International Credit and Investment Company (Holdings) Limited ("ICIC Holdings").

2. The liquidators of BCCI Holdings, BCCI SA, BCCI Overseas, ICIC Overseas, ICIC Holdings and Credit and Finance Company Limited ("CFC") will be referred to, collectively, as the Court Appointed Fiduciaries.

trading activities in the United Kingdom, but continues to operate as a dealer in foreign exchange. Capcom UK has been indicted in the United States and, on April 30, 1992, the U.S. District Court for the Middle District of Florida declared Capcom UK in contempt of court for failure to appear to answer the criminal charges stemming from its August 1991 indictment. *Id.* at ¶ 35. The Court imposed a $5,000/day fine, which continues to accrue. *Id.*

4. Defendant Capcom U.S. was an Illinois corporation that was incorporated in 1985 and a subsidiary (or under the control) of Capcom UK. *Id.* at ¶ 31. "Capcom U.S.'s nominal business purpose was to engage in brokerage in futures, options and commodities on the Chicago exchanges." *Id.* Capcom U.S. has ceased trading after being fined and suspended by U.S. regulators. *Id.* at ¶ 32. On April 16, 1992, Capcom U.S. filed voluntary articles of dissolution, but is still subject to suit under Illinois law. *Id.*

The plaintiffs allege that, beginning in or around 1977 until the present, the defendants conspired with Agha Hassan Abedi ("Abedi")[3] and Swaleh Naqvi ("Naqvi"),[4] who adversely dominated the BCCI Group, *id.* at ¶ 40, to "manipulate plaintiffs' balance sheets to conceal large losses and to conceal fraudulent activity by" Abedi and Naqvi. *Id.* at ¶¶ 1–3. In connection with their scheme, the defendants are alleged to have diverted in excess of $100 million through fraudulent transactions. *Id.* at ¶¶ 2 & 5.

To perpetuate the fraud, Khalil served as a nominee shareholder, inflating the plaintiffs' apparent capitalization and concealing from banking regulators the secret ownership of First American. *Id.* at ¶¶ 3, 48–59 & 60–61. In April of 1981, Khalil is alleged to have met with Robert A. Altman and Clark M. Clifford to prepare a false statement shares that would be submitted to the Federal Reserve regarding Khalil's proposed purchase of CCAH. *Id.* at ¶¶ 60–64. Additionally, the defendants used Khalil's accounts to conceal losses, generate false profits on the plaintiffs' balance sheets and to hide high-risk commodities investments and profiteering under guaranteed no-risk arrangements for Khalil. *Id.* at ¶¶ 84–96. Defendants Akbar and Khalil are alleged to have created and used Defendants Capcom UK and Capcom U.S. as mechanisms to plunder the plaintiffs. *Id.* at ¶¶ 4 & 99–134.

The plaintiffs allege that Khalil obtained at least $29.5 million for allowing his name and accounts to be used as a nominee, including his service as a nominee for First American shares. *Id.* at ¶¶ 65–66 & 148. Of this amount, Khalil is alleged to have extorted $15 million "for his having acted as a nominee in various fraudulent schemes with Akbar, Abedi and Naqvi, including the nominee ownership in CCAH." *Id.* at ¶ 149.

The Complaint alleges seven counts. Count I alleges racketeering under RICO based on Khalil's acquisition of a nominee interest in First American. *Id.* at ¶¶ 168–181. The predicate acts constituting the pattern of racketeering include wire and mail fraud, financial institution fraud and money laundering. *Id.* at ¶¶ 175–180. Based upon the defendants' alleged acts of wire and/or mail fraud and money laundering, Count II charges racketeering in connection with the manipulation of BCCI balance sheets through fraudulent nominee transactions perpetrated through U.S. bank accounts and U.S. wires. *Id.* at ¶¶ 168–181. Counts III and IV allege RICO violations based upon

---

3. Abedi founded the BCCI Group and served as its top corporate officer from 1973 until approximately February 1988, when he suffered a heart attack and was succeeded by Swaleh Naqvi. Abedi remained an officer and director of the BCCI Group until in or about October 1990. In 1991 and 1992, Abedi was indicted by New York and federal grand juries stemming from his involvement in the illegal acquisition of First American Bankshares, Inc. The Court has been informally advised that Abedi died in Karachi, Pakistan sometime during 1995.

4. Naqvi was the BCCI Group's principal assistant corporate officer from 1973 until 1988, when he succeeded Abedi. He served as the top corporate officer until in or about October 1990 and as an advisor through July 1991. In 1991 and 1992, Naqvi was indicted by New York and federal grand juries due to his role in the illegal acquisition of First American. On July 8, 1994, Naqvi entered his guilty plea to a federal information before this Court. He was sentenced to eleven years and is currently incarcerated.

**4**

the defendants' operation of Capcom U.S. and Capcom UK in carrying out fraudulent transactions on U.S. futures and commodities exchanges, resulting in the diversion of funds from the plaintiffs to Defendants Khalil and Akbar. *Id.* at ¶¶ 195–221. In Counts V, VI and VII, the plaintiffs allege common law counts of fraud, conversion and unjust enrichment based on the defendants' operation of Capcom U.S. and Capcom UK. The plaintiffs seek compensatory damages estimated in excess of $500 million, punitive damages in the amount of $500 million and, they demand the disgorgement of all funds fraudulently obtained.

## II. Discussion

Khalil moves to dismiss the complaint on four grounds: (1) the Court Appointed Fiduciaries lack the authority to sue on behalf of the plaintiffs; (2) lack of subject matter jurisdiction; (3) lack of personal jurisdiction; and (4) failure to state a claim. Each will be considered in turn.

The standard applicable to a motion to dismiss is clear: it should not be granted "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kenneda v. United States,* 880 F.2d 1439 (D.C.Cir.1989). The factual allegations of the complaint must be presumed true, *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994); *see* 5A Wright & Miller, Federal Practice and Procedure: Civil 2d § 1357, at 304 (1990), and plaintiffs are entitled to all favorable inferences which may be drawn from those allegations. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Nonetheless, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal,* 16 F.3d at 1276.

### A. *Standing*

■ Khalil argues that the Court Appointed Fiduciaries lack the authority to sue on behalf of the plaintiffs, because "[f]or more than a century, it has been the common law rule in the federal judicial system that a

receiver of a corporation cannot be empowered by the appointing court to sue in another jurisdiction, either in his own name or in that of the corporation." *See* Motion to Dismiss, at 6 (quoting *Great Western Mining and Mfr. Co. v. Harris,* 198 U.S. 561, 563, 25 S.Ct. 770, 49 L.Ed. 1163 (1905) and citing *Collins v. McDonald,* 98 F.2d 258, 259 (D.C.Cir.1938)) (internal quotations omitted). Additionally, he argues that because this Court has previously determined that ICIC Holdings was the alter ego of BCCI, that it has no independent corporate existence and is, therefore, collaterally estopped from maintaining suit. *Id.* at 7. Both arguments are meritless, and they will be rejected.

■ The Court Appointed Fiduciaries were appointed as the official liquidators of the BCCI Group under the law of Luxembourg and the Cayman Islands in 1992 and 1993. *See* Complaint ¶¶ 18–25. This Court is among those courts in the United States that have recognized the validity of those appointments. *See United States v. BCCI Holdings (Luxembourg), S.A.,* Crim. No. 91–0655(JHG), Transcript of Arraignment and Offer of Plea, at 4 (D.D.C. January 24, 1992); *see also United States v. BCCI Holdings (Luxembourg), S.A,* 46 F.3d 1185, 1187–88 (D.C.Cir.), *cert. denied,* 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); *In re Petition of Smouha,* 136 B.R. 921, 923–24 (S.D.N.Y.), *appeal dismissed,* 979 F.2d 845 (2d Cir.1992). Recognition of foreign liquidators is fully consistent with the rationale of Rule 17 of the Federal Rules of Civil Procedure. *Mentink v. World Time Corp.,* 131 F.R.D. 210, 211 (S.D.Fla.1990).

The recognition of liquidators or trustees appointed by foreign courts to act as receivers empowered to sue and be sued on behalf of insolvent corporations is neither unusual nor contrary to federal law. *See, e.g., Canada Southern Ry. Co. v. Gebhard,* 109 U.S. 527, 536–39, 3 S.Ct. 363, 27 L.Ed. 1020 (1883); *Victrix S.S. Co. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713–15 (2d Cir.1987); *Cunard S.S. Co. v. Salen Reefer Serv. AB,* 773 F.2d 452, 456–59 (2d Cir.1985); *Clarkson Co. v. Shaheen,* 544 F.2d 624, 629–30 (2d Cir.1976); *Clarkson Co. v. Rockwell Int'l Corp.,* 441 F.Supp. 792, 796–97 (N.D.Cal.

1977); *Mentink,* 131 F.R.D. at 211; *In re Hourani,* 180 B.R. 58, 63–64 & n. 9 (Bankr. S.D.N.Y.1995). The doctrine of comity requires recognition of a foreign liquidator's capacity to sue and be sued in courts of the United States. *IIT v. Cornfeld,* 462 F.Supp. 209, 217 (S.D.N.Y.1978), *aff'd in relevant part,* 619 F.2d 909 (2d Cir.1980); *see also In re Colorado Corp.,* 531 F.2d 463, 468–69 (10th Cir.1976); *Cornfeld v. Investors Overseas Servs., Inc.,* 471 F.Supp. 1255, 1259 (S.D.N.Y.), *aff'd,* 614 F.2d 1286 (2d Cir.1979).

In recognizing liquidators for a Luxembourg corporation, the *Cornfeld* court stated: "From a practical standpoint, recognition is a necessity if the liquidators are to continue in their difficult task of recouping the assets of the fund that may exist in countries all over the world, and their efforts to recover the assets of a worldwide community of investors is consistent with the general policy of the United States." *Cornfeld,* 462 F.Supp. at 217. This statement applies with equal, if not greater, force to foreign liquidators who seek to recoup the recovery of BCCI assets on behalf of the worldwide community of creditors and debtors of BCCI who were defrauded.

The cases upon which Khalil rely are simply inapposite to the situation presented in this case, *see Mentink,* 131 F.R.D. at 211, and they warrant no further discussion.

Khalil's alternative argument, that ICIC Holdings lacks standing because it lacks an independent corporate existence, is also rejected. Contrary to Khalil's understanding of the facts, this Court never determined that ICIC Holdings was an alter ego of the plaintiffs. This Court held that International Credit and Investment Company Limited ("ICIC Investments") was the alter ego of certain defendants. Order of July 29, 1992, *United States v. BCCI Holdings (Luxembourg) S.A.,* 795 F.Supp. 477, 480 (D.D.C. 1992). While ICIC Investments is not one of the plaintiffs in this action, the defendant has failed to identify any reasons or authority that indicate that it would not have standing to sue. *See, e.g., First Nat'l City Bank v. Banco Para El Comercio,* 462 U.S. 611, 631–33, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (plaintiff bank held to be alter ego of Cuban government).

## B. Subject matter jurisdiction

■ Khalil argues that the Court lacks subject matter jurisdiction because RICO cannot be applied extraterritorially. However, the facts pleaded make clear that this is not what the plaintiffs are attempting to do. While the Complaint alleges conduct that is both foreign and domestic, the plaintiffs have adequately pleaded a pattern of racketeering activity which, in significant part, occurred in the United States. *E.g., Thai Airways Int'l Ltd. v. United Aviation Leasing B.V.,* 842 F.Supp. 1567, 1571 (S.D.N.Y.), *later op.,* 891 F.Supp. 113 (S.D.N.Y.1994), *aff'd,* 59 F.3d 20 (2d Cir.1995). The Complaint alleges in detail the continuous use of U.S. bank accounts and U.S. wires by Khalil and others to effectuate the transfer of funds. *See, e.g.,* Complaint at ¶¶ 65–67, 77, 96–97, 134, 152, 176 & 191. Contrary to Khalil's characterization, *see* Motion to Dismiss, at 14, the multiple wire transactions were "not merely preparatory" acts, but were central to the scheme. *E.g., Thai Airways,* 842 F.Supp. at 1571.

The use of United States bank accounts and wires is not the only basis for RICO jurisdiction. As a nominee, Khalil participated in the conduct of the affairs of a U.S. corporation, Capcom US, beginning with its establishment in 1985. *Id.* at ¶ 133. Khalil also traveled to Washington, D.C., on or about April 23, 1981, for the purpose of making false representations to the Board of Governors of the Federal Reserve:

On April 23, 1981, Khalil met with Washington, D.C. attorneys Robert Altman and Clark Clifford in the District of Columbia. Clifford and Altman prepared a statement on behalf of Khalil falsely stating that Khalil intended to fund his proposed purchase of CCAH shares from his own resources and that he would be the beneficial owner of the shares. Khalil approved this statement and it was submitted to the Board of Governors.

Khalil appeared before the Board of Governors posing as a prospective beneficial owner of CCAH. Khalil knew that he would have no beneficial interest in CCAH

and his appearance was designed to and did deceive the Board of Governors as to the true ownership of CCAH.

*Id.* at ¶¶ 62–63.

These actions, in combination with the numerous predicate offenses engaged in by the defendants in the United States, *e.g.*, financial institution fraud, travel act violations, extortion, and money laundering, establish a pattern of racketeering activity in the United States. *See Environmental Defense Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C.Cir. 1993).

Additionally, the alleged racketeering activity had substantial effects in the United States. The defendants are alleged to have participated in a conspiracy that played no small part in the collapse of BCCI, which triggered a series of investigations in the United States and abroad, and which resulted in the criminal forfeiture of BCCI's assets causing a tangible and massive loss to BCCI depositors. The scheme alleged in the complaint contributed to numerous indictments, charges, administrative proceedings, congressional hearings, and criminal and civil litigation in the United States. These substantial effects, in conjunction with a scheme involving significant conduct in the United States, are sufficient to establish subject matter jurisdiction. *See Massey*, 986 F.2d at 530–32; *see also Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118, 121–22 (2d Cir.1995), *cert. denied*, 516 U.S. 1044, 116 S.Ct. 702, 133 L.Ed.2d 659, *and cert. denied*, 516 U.S. 1044, 116 S.Ct. 703, —— L.Ed.2d —— (1996); *Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir.), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1358–59 (9th Cir.1988) (en banc), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989).

#### C. *Personal jurisdiction*

■ Next, Khalil contends that his contacts with the forum are insufficient for the Court to assert personal jurisdiction over him. He is not correct. The Court previously held that Khalil's participation in the fraudulent acquisition of First American was sufficient to establish personal jurisdiction, *see First American v. Zayed, et al.*, Civ.A.

No. 93–1309(JHG) (D.D.C. August 25, 1995), Mem. op. at 18, and the facts alleged here lead to a similar result.

■ The District of Columbia long-arm statute permits this Court to exercise "personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—(1) transacting any business in the District of Columbia." D.C.Code Ann. § 13–423(a). A defendant need not transact extensive business in the District of Columbia to be subject to personal jurisdiction here. *Mitchell Energy Corp. v. Mary Helen Coal Co.*, 524 F.Supp. 558, 563 (D.D.C.1981); *Environmental Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 811 (D.C.1976) (en banc). In fact, "a nonresident defendant need not have been physically present in the District" to be subject to personal jurisdiction here. *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C.1981) (en banc), *cert. denied*, 455 U.S. 1006, 102 S.Ct. 1643, 71 L.Ed.2d 875 (1982). Because the statute will reach as far as the Constitution will allow, *see Crane v. Carr*, 814 F.2d 758, 762 (D.C.Cir.1987), the critical inquiry is whether the business transacted within the District of Columbia "can be reached jurisdictionally without offending the due process clause." *Mouzavires*, 434 A.2d at 993; *see Dooley v. United Tech. Corp.*, 786 F.Supp. 65, 71 (D.D.C.1992); *Brown v. Artery Org., Inc.*, 654 F.Supp. 1106, 1110 (D.D.C.1987).

■ This standard is satisfied by the facts alleged. The Complaint avers that Khalil and others agreed that Khalil would act as a nominee shareholder of First American's ultimate parent, CCAH. Complaint, at ¶¶ 39 & 60–61. In furtherance of the conspiracy, Khalil traveled to Washington, D.C., and appeared before the Federal Reserve for the purpose of making fraudulent representations. *Id.* at ¶¶ 62–63. During his trip to Washington, he had significant meetings with his co-conspirators and others regarding the nominee acquisition of First American, a D.C.-based financial institution. *Id.* at ¶¶ 62 & 64. Khalil later became a nominee shareholder of First American and remains a nominee shareholder to this day. *Id.* at ¶ 80. It does not offend "traditional notions of fair

play and substantial justice," *International Shoe v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), to hold Khalil subject to suit in the forum where he engaged in the above described acts and where the effects of the fraudulent scheme (of which he was a part) were felt.[5] Additionally, the Complaint alleges in detail conduct by Khalil's co-conspirator Akbar that is sufficient to establish personal jurisdiction on the basis of their conspiracy. *Dooley*, 786 F.Supp. at 78.

### D. *Failure to state a claim*

Finally, relying in part upon *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), Khalil raises many of the same objections that this Court has rejected previously in *First American v. Zayed*, Civ.A. No. 93–1309(JHG) (D.D.C. August 25, 1995); *see also id.*, Mem. op. (Nov. 26, 1996). These arguments have no more merit here than they did in *Zayed*. The plaintiffs have adequately pleaded their civil RICO claims and common law claims, *see Zayed*, Mem. op. at 26–33, and these claims are not barred by the statute of limitations due to the well-pleaded allegation of adverse domination. *See RTC v. Gardner*, 798 F.Supp. 790, 795 (D.D.C.1992). And, as in *Zayed*, *Bangor Punta* is inapposite to this suit. *See Zayed*, Mem. op. at 13–14.

### III. Conclusion

Accordingly, it is hereby

**ORDERED** that the motion to dismiss is denied.

IT IS SO ORDERED.

---

**5.** Contrary to Khalil's claim, the "government contacts" exception does not extend to contacts with the federal government by an alien for the purposes of perpetrating a fraud. *Naartex Con-* *sul. Corp. v. Watt*, 722 F.2d 779, 787 (D.C.Cir. 1983), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984).